## Continuation of Application for Search Warrant

Based on my knowledge, training and experience, and the investigation of law enforcement officers with personal knowledge and with whom I am working, I, Cecil Queen, being duly sworn, depose and state as follows:

### INTRODUCTION

1. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically, 18 U.S.C. § 922(g)(1) [Felon in possession of a firearm] and 21 U.S.C. § 841(a)(1) [Possession of methamphetamine with intent to distribute] (the **Subject Offenses**) will be found on the following cellular phone: a Samsung Model: SM-G975U (S10+), serial R38MA0HBCKT, with a black front screen and a cracked, light-blue back, currently in the possession of HSI Grand Rapids (the **Subject Device**). The categories of electronically stored information and evidence sought are described in Attachment B.

2. This Application requests the issuance of a warrant to examine the **Subject Device** for evidence of the **Subject Offenses**.

### APPLICANT'S TRAINING AND EXPERIENCE

3. I am a Special Agent (SA) with Homeland Security Investigations (HSI), a position I have held since approximately September 2018. Before I became an HSI SA, I served for over seven years as a sworn officer with local Michigan agencies, primarily the Kalamazoo Township Police Department. As part of my duties, I investigate criminal violations relating to narcotics and firearms, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 922. In addition, I have received formal training in investigating contraband smuggling, narcotics trafficking, and firearms offenses.

4. I know from training and experience that people often carry their cellular phones with them at all time and use cellular phones to communicate via various means, including by text, social media, internet, email, voice, and voicemail. Cellular phones store other data that can be recovered forensically even after deletion by the user, as well as Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device, and therefore the user, was located in the vicinity of a crime.

5. Cellular phones also generate internet use history that can reveal the websites or internet queries entered by the person using the device, including searching for the addresses of various businesses or other locations.

6. I also know from training and experience that drug traffickers frequently use mobile telephones and other electronic devices to facilitate drug trafficking. Mobile telephones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so narcotics traffickers often use the devices in an effort to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls and text messages with suppliers of narcotics; voicemail messages; photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time, providing evidence that the device was in high drug trafficking areas or showing the route used in trafficking narcotics. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. In my training and experience, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics. I also know from training and experience that drug traffickers often utilize the camera/video function on their mobile telephones to take pictures/videos of narcotics, currency, firearms, high-value items and coconspirators.

### PROBABLE CAUSE THAT ONE OR MORE OFFENSES HAVE BEEN COMMITTED

7. On 4 Feb. 2020, I participated with the Kalamazoo Department of Public Safety (KDPS) and the Kalamazoo Valley Enforcement Team (KVET) in conducting surveillance of Jeremie Ennis, the defendant in this Court's Case. No. 1:20-CR-41. Ennis' criminal history includes seven felony convictions received between 2006 and 2018 for offenses that include controlled substance offenses and assaults with a dangerous weapon and with intent to do great bodily harm.

8. When the surveillance was initiated, Ennis was the subject of two active arrest warrants issued by courts of the State of Michigan. KVET investigators had recently received information from a reliable confidential informant (CI) that Ennis was actively involved in distributing methamphetamine in the Kalamazoo area, was driving a white Chevrolet Impala with black wheels, and possessed at least two firearms and was likely armed. In addition, at the time Ennis was also the subject in two open KDPS cases, the first of which was for a non-fatal shooting on 4 Oct. 2019, and the second of which was for an unarmed robbery on 26 Jan. 2020.

9. Ennis' vehicle was initially located while parked in the driveway of a residence on Hazard Avenue in Kalamazoo that is known to law enforcement as a location associated with methamphetamine distribution and use. Investigators saw

a white male believed to be Ennis exit the residence and get into the vehicle, and followed as the vehicle drove to Wallace Avenue, where it made a short street-stop consistent with making a drug deal before continuing on to a party store located at 806 Riverview. There, the driver backed into a parking spot facing away from the store, and an undercover officer familiar with Ennis drove past and positively identified the driver as Ennis.

10. KVET officers, driving two unmarked vehicles but wearing vests emblazoned with highly visible "Police" markings, then drove into the store parking lot and maneuvered their vehicles to block Ennis' vehicle from escaping. As they did so, Ennis, looking directly at them through his windshield from a few meters away, accelerated out of his parking spot and rammed into both KVET vehicles before jumping out of his vehicle and beginning to run.

11. KVET officers exited their vehicles and ran after Ennis, shouting "stop" and tackling him behind his now disabled vehicle. As the four officers struggled with Ennis, one of them saw a pistol tucked inside his waistband and shouted that fact to the other officers before pulling the pistol out of Ennis' trousers. Because the CI had reported that Ennis possessed two firearms, the officers did not know at the time whether Ennis was still armed.

12. Ennis refused repeated commands to place his hands behind his back, and continued to fight with the officers notwithstanding multiple blows and repeated application by one of the officers of a Taser. One of the officers had drawn his service pistol after exiting his vehicle, and his arm was pinned to the ground under Ennis during the fight. Ennis did not stop fighting until officers succeeded in forcing his hands behind his back and applying handcuffs, at which point he stated, "I'm done fighting. I'm done fighting. You took it out of me."

13. Ennis was then searched incident to arrest, and although no other weapons were found on his person, officers recovered $3330 in U.S. currency and what was later determined to be over 66 grams of methamphetamine from his pockets, along with two additional loaded magazines for the pistol that had been recovered. That pistol was a Sig Sauer P229 .40 caliber semiautomatic that was loaded with a 12-round magazine and had a 13th round in the chamber, and it had been reported stolen to Michigan State Police on 2 Dec. 2019. An inventory search of the vehicle discovered four digital scales, plastic baggies of the sort used by drug distributors, a large double-edged fixed-blade knife sitting between the front seats, and a container holding .40 caliber pistol ammunition. The **Subject Device** was found between the front seats.

14. Once he had been subdued, Ennis was read his Miranda rights and waived those rights. He stated that he realized that the two vehicles that were moving to block him in were police vehicles before he rammed them, and that he

tried to get away even though he expected that he would fail. He guessed that he had $3600 or $3700 cash on him at the time, along with roughly two ounces of methamphetamine. He acknowledged that he was a previously-convicted felon, and said that he had bought the pistol on the street because he could not buy one at a gun store. Ennis also admitted that the **Subject Device** was his

15. Paramedics called by the officers arrived at about the time Ennis' interview was drawing to an end, and although he refused medical treatment, Ennis continued talking to paramedics as they assessed him. He stated, "if it ain't me selling this shit it's going to be someone else. Why not get a piece of the pie myself, you know what I mean?" He also stated, "it's not like I'm putting a gun to anybody's head saying, 'buy this fucking dope.'"

16. The interviewing officer also asked Ennis why he was carrying a gun, and Ennis replied, "I make a lot of drug sales riding around. I sell dope, man. You see that's why I had almost 4 fucking grand on me and ice [methamphetamine] and a gun, man. I do that to protect myself, brother."

17. Although Ennis had refused on-scene treatment by paramedics, he was taken to a local hospital to be examined before being lodged at the Kalamazoo County Jail. There, a leather inside-the-waistband pistol holster that was compatible with a Sig 229 was recovered from Ennis' trousers.

18. Based on training and experience, I know that 66 grams of methamphetamine is a distribution quantity. I also know that digital scales and plastic baggies are tools of the drug-distribution trade, as are firearms. Laboratory testing of the drug later determined that its purity is approximately 85%.

19. Based on the above information, as well as my knowledge, training and experience in firearm investigations, I respectfully submit that there is probable cause to believe that the **Subject Device** contains evidence of the **Subject Offenses**.

20. The **Subject Device** is currently in storage at the Grand Rapids office of HSI. The **Subject Device** has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as it was when the **Subject Device** was first seized.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* This application seeks permission to locate forensic electronic evidence that establishes how the **Subject Device** was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. Because the examination authorized by the warrant will be conducted by HSI employees on HSI premises, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## CONCLUSION

26. Based on the above facts, I submit there is probable cause to believe that the **Subject Device** described in Attachment A contains evidence and fruits of crimes, as further described in Attachment B, specifically relating to violations of 18 U.S.C. § 922(g)(1) [Felon in possession of a firearm] and 21 U.S.C. § 841(a)(1) [Possession of methamphetamine with intent to distribute] in the Western District of Michigan.